Consolidation Coal v. Workers' Compensation Comm'n 5090252 Council, please. Good morning, Your Honors. My name is Cheryl Introvaya. I'm here on behalf of Consolidation Coal Company. Consolidation Coal Company appealed the decision that was issued by the Commission. The Commission decision affirmed the arbitrator's decision that awarded 20% man as a whole to Mr. Berg. The issues that we have asked this Court to review involve Section 1F of the Occupational Disease Act as well as the notice provisions found in Section 6C. With regard to the Commission's finding of timely disablement, Section 1F of the Occupational Disease Act requires that an employee prove he was disabled within two years of his last date of exposure at the coal mine. In this case, Mr. Berg left the coal mine on March 5, 2001. Okay? Now, if you look at the evidence in a timeline fashion here, the very first piece of evidence that is developed in this claim is a chest film that was read, that was dated January 26, 2004. The Commission obviously placed reliance on the reading by Dr. Alexander, who is a bee reader. The employer's bee reader found that film to be negative. However, there was nothing in Dr. Alexander's report that indicated when this condition may have occurred. And it was not until the petition was examined by Dr. Kahn, which occurred in January of 2006, nearly five years after Mr. Berg left the mine, that he set forth his opinion that he would have had this condition when he left the mine. Now, Dr. Kahn didn't look at any of the medical records, and he also testified that it was just as possible, or not just as possible, but it was possible that the condition could have developed after he left the mine. Now... Mr. Gervais, let me ask you a question. Yes, sir. Dr. Alexander, did he not, back in looking at an x-ray, a chest x-ray taken on October 15, 1981, his interpretation was that it showed that CWP was present at that time, correct? That was Dr. Alexander's interpretation of the film. There is also an interpretation of that film in the record from the original facility where they took that film, and the reading by that physician was no active lung disease. So why isn't it just weight and credibility? I'm sorry? Why isn't it just a simple question of weight and credibility for the physician himself? It would be, Your Honor, except for the fact that if you're going to put all your weight on Dr. Kahn, who wasn't a pulmonologist, wasn't a bee reader, didn't follow American Thoracic Society guidelines for his pulmonary function studies, didn't use the NIOSH film to look at a film, and you still wanted to say, you know what, I think Dr. Kahn was the more credible, you certainly could, but if you're going to bite that apple, you need to eat the entire apple. And what the commission never addressed was the fact that Dr. Kahn also testified in his opinion that if Mr. Byrd had poll worker's pneumoconiosis and had emphysema and had shortness of breath and all of the other findings that Dr. Kahn found in January of 2006, and they were related to coal dust, then those same symptoms, that same everything would still be seen six months later. Okay? Dr. Westerfield's exam was taken six months later, and if you look at the findings from Dr. Westerfield's examination, none of the findings that Dr. Kahn made are there. Didn't find pneumoconiosis, didn't find emphysema, didn't find an obstructive condition. His PFTs, when he was examined six months later, were nearly perfect. They were 99 and 98 percent. What happened? Did it go away between January the 26th, 2004, and June the 6th, 2006? It certainly would appear that way. That's if you believe Dr. Westerfield. And it occurs to me that the commission didn't believe him. Well, the objective testing are values that the petitioner... What's the objective testing? The spirometry is an objective test. They're both B-readers. Alexander and Westerfield are both B-readers. Okay. Alexander says it's there, Westerfield says it's not. The commission sides with Alexander in this story. It seems to be the way this works. Well, if he has pneumoconiosis, then how did he manage to get his pulmonary infection studies to come back into the range of normal? This is a permanent progression. Why don't you believe Westerfield's opinions? Okay. Then we'll just assume that we're not going to believe any of Dr. Westerfield's opinions, even though he's a B-reader and a board-certified pulmonologist. Well, look, if you believe Alexander that the chest x-ray of January the 6th, 2004, reveals the abnormalities consistent with CWP, then you can't believe Westerfield's opinion in January, June the 6th, 2006, where he says he found no evidence of any pulmonary disease, because we know that CWP doesn't go away. So if he had it, then he continued to have it. So if you believe Alexander, you can't believe Westerfield. Okay, well, then if you want to believe Dr. Alexander and you don't want to believe Dr. Westerfield, that's fine. The problem with that then moves you into the second argument, which is the notice problem. If you want to say that Dr. Alexander was right and that Mr. Byrd had co-workers pneumoconiosis in 1981 and he managed to work in the coal mine for an additional 21 years, the classification is the same. It obviously never worsened. And beyond that, with the notice, we don't have a 45-day provision like they have under the Workers' Compact. The Occupational Disease Act says you have to provide notice to the employer as soon as practicable after disability is determined. What prejudice did you suffer? I'm sorry? What prejudice did you suffer? Well, I think we need to figure out if the notice was timely before we're going to move on to prejudice. But there is no 45-day rule. It just says as soon as practicable. So what prejudice did you suffer? That's your burden to establish. Well, Your Honor, if he had co-workers pneumoconiosis in 1981 as alleged by Dr. Alexander, certainly there would be prejudice to keep him in the mine an extra 20 years if that was the condition. On top of that, the 1981 film was destroyed. What did the Commission say about the failure to give notice? They simply affirmed the arbitrator's finding that notice was sufficient and timely prejudice was not shown. One of the issues that had to do with the prejudice was the fact that there was the film taken at Pinckneyville, the one that was originally read as no active lung disease. The employee had it read. When they returned that film to the facility, they destroyed it. The day is Pinckneyville, not the employee. I'm sorry? Pinckneyville destroyed it, not the employee. That's correct. And how many years after the filing of this case was that? It would have been in 2006, so it would have been five years after the case was filed. And what were you doing for those five years in attempting to get his medical records and view these prior films? Well, the last time I checked, Your Honor, it was the petitioner's burden, and until we're provided with evidence that they're even going to prove their case, they provided us with Dr. Alexander's review of the film in 2006. When we received the review of the film, Your Honor, we tried to obtain the film and we were advised that it was destroyed. You mean to tell me that when you're faced with a co-worker's pneumocomiosis case when it's filed, you don't attempt to get his prior medical records and his prior lung capacity tests that we know that every one of these coal miners undergoes on a regular basis? You wait until the petitioner does something before you do that? Well, Your Honor, basically, the way the cases are run, and obviously there's nothing of this in the record, they have three years to put their case together, and once they've shown us some evidence that they will have a case to make, not every case is made, then yes, we certainly develop evidence at that point. But you could have gone after his medical records, including those records during that five-year period, could you not? Yes. Nothing prevented it. Nothing prevented us from doing that, Your Honor. And when the records were obtained, which they eventually were, and consisted of 40 years of medical records, those physicians never diagnosed any occupational disease over that entire 38-year process, and those records are in the record. So even had we obtained those records, there was no evidence that Mr. Byrd had an occupational disease. It was only after they had their B-reader go back and read a film from 1981 that it suddenly became a positive film. It was not a positive film with what was written in the records. Moving back to the notice issue, there is no definite time period, and it becomes as soon as practicable. In this case, a petitioner is required to prove that he's disabled within two years after he left the mine. Based on the commission's decision, they're saying he was disabled when he left the mine. Now in this case, the case was filed in February of 2004. If he was disabled when he left the mine in March of 2001, it's very difficult to see how as soon as practicable encompasses a three-year period, especially when viewed against a 45-day time period for workers' compensation cases, including repetitive trauma. It's our position that you cannot meet both Section 1F and Section 6C of the Occupational Disease Act if you have a notice requirement that is being allowed to be filed over almost three years after someone left the mine, and if you want to take credence with Dr. Alexander's positive chest x-ray of the 1981 film, it's now 23 years after he supposedly developed the disease and was disabled. Twenty-three years is not as soon as practicable in any lifetime. And for these reasons, we have requested this board review the findings of the commission, including their reliance on Dr. Kahn, whose qualifications were not similar to the other side in light of the fact that there were nearly 40 years of medical records that did not establish any occupational disease whatsoever, and also taking into consideration the well-known scientific principle that co-workers' pneumoconiosis is a permanent and progressive disease. So if he really had it in 1981 and he had it in 2004, there was no change on that film. The levels are the same, but yet when we have pulmonary function studies, one done in January of 2006 and one done in June of 2006, those numbers suddenly become normal. This is not how co-workers' pneumoconiosis affects. This goes against the entire principle of what the case law has been based on. So we're asking the court to review this. Are there any further questions, Your Honors? Thank you, Counsel. Counsel, please. If it pleases the court, my name is Bruce Besore, and I represent Orangeburg. I'm going to start with Consall's arguments on notice and his constitutional concerns about the exact day of disabling notice, and then finish with the bread and butter issue. First, Consall says that the filing of the claim isn't notice, but is a matter of law and is a matter of fact. The filing claim has to be notice of some kind. The only question would be whether it's sufficient notice. In Blackhound claims like this one, there's no prejudice to the company based on the timing of the filing, as long as it's filed within the statute of limitations, because the minor is still there to be examined and all the medical records are still available. But even if the filing were found not to be sufficient, it would just make the notice defective, and the burden would shift to the coal company to show that it was unduly prejudiced by the delay of the notice. In this case, the Commission answered both those questions. It said the notice was sufficient, and that Consall didn't show any prejudice due to the timing of the notice. Those decisions of the Commission are proper, and the consolidation can't show any evidence in the record to the contrary. Now, Consall raised that issue of the 1981 x-ray from Pinckneyville Hospital as an example of prejudice due to the timing of the notice. It was destroyed before they could have it read. But that's not really an issue in this case for three reasons. First, Consall didn't object to Dr. Alexander's reading of that x-ray, and that was after the proofs were left open for 60 days to consider just what to do about that x-ray. Then, when the arbitration was reconvened, the arbitrator asked if Consall objected to Dr. Alexander's reading as hearsay, and counsel said no. Then the arbitrator said, you have no objection? Counsel said, correct. Second, even though Consall said he had no objections to Dr. Alexander's report, the arbitrator said he'd assumed that Consall had obtained a negative reading of the x-ray when he made his ruling. And Consall, in his briefs, says that this means the arbitrator wasn't going to pay any attention to his reading, but it could just as easily be looked at as construing the evidence most favorably to Consall. They didn't even have a reading. They weren't going to object to our reading. Yet the arbitrator assumed that they did have a reading, and it was negative. Third, and most important, this case doesn't turn on the 1981 x-ray. That x-ray wasn't necessary for the commission to find the disease existing. The issue of disease was taken care of by the exams of Kahn and Westerfield. The only value of that 1981 x-ray was more proof that there was this ailment prior to the running of Section 1F. But it wasn't even needed for that, because Dr. Kahn said the pneumoconiosis would have been there when he left mining, and Dr. Westerfield was specifically asked if it's possible for somebody to work in the mines for 32 years, be gone from the mines for two years, and have no pneumoconiosis, and then develop it later. And he said, quote, I've never seen that in my experience, and I can't cite any medical literature that supports that theory. And the commission's decision says, even in the absence of this positive reading, established disease and timely disabling. So recognizing that it is up to the commission, as we all know, to assess the credibility of the witnesses and the weight to be given to the testimony, Mr. Trevaya raises a question, I think, that has some logical and medical appeal. How is it, then, if he was suffering from CWP in 1981, that the lung functional capacity test 25 years later seems to be normal? How do you reconcile those two findings? Well, first, co-worker's pneumoconiosis in these cases is measured three ways. Radiographically, do you have the scar showing up on your chest? Second, do you have physical examination findings of it? That's the most crude, least probative. And the third is the pulmonary function test. As the testimony in this case says, in all the cases, you can have pneumoconiosis by x-ray and have normal PFTs, normal physical exam, and even no complaints. But that doesn't reduce the fact that you shouldn't have any more exposure, because it can progress. In fact, it can progress in pain. So the fact that that 1981 x-ray is positive, and this kind of gets into Goncalo's argument, they're saying, well, he knew about it then, or he should have known about it then, or he could have known about it then, so why do we have to wait 23 years? Well, in black lung, we're always working with proving the impossible to prove. There's no way for me to tell you what day this man's x-ray turned from negative to positive. It just can't happen. But we have to deal with it for Section 1F, for statute of limitations, for when disablement began. And the courts have developed a way to do that. The question is never when and why did he leave Miami. The question is, can he go back? Therefore, the date of disablement is the date he left home, when the existence of the disease is coupled with the fact that he's no longer working as a minor, and the question becomes, can he go back? In this case, since the Commission found him with homeosis, it found functional disablement, which may or may not be able to be measured, but it's thereby discarded, and the fact that he shouldn't go back to the coal mine. They found that disablement. It's their decision to make. I've had cases where I thought those things were obvious, and they didn't agree with me. I lost them. I've won this one, and I think the evidence does support the Commission. The basic problem with Gonzalo's argument is that it confuses a traumatic injury and a disease. It wants the rules to be the same. But that's not how the legislature looks at it. It's not how the courts looked at it over the years. When a minor gets hit on the head with a rock, everybody knows when it happened, where it happened, who the ambulance driver was, who the doctor was, and how many stitches he had. But when the minor breathes that rock into his lungs over a course of 30 years, nobody knows any of those things. With black lung, it's impossible to know the exact date the X-ray turned from negative to positive. Therefore, you can't say which day it became unsafe for him to return. I think the case law is clear that even if the minor keeps working despite black lung, his O.D. claim is not prejudiced because he continued to work despite the risk or despite physical difficulties. His clock doesn't start to run at the first sign of disease. It starts to run the day he leaves the mine, either because he physically can't go back, because he decides he shouldn't go back, or because circumstances make it impossible for him to go back. And in this case, his clock started to run on the day he left the mine because of his breathing problems. He said the company started to make him work 10-hour days. He used to work 8. He couldn't do the 10 anymore because of his breathing problems. And he was found to be a credible witness. Now, I've got some analogies on this proof of the disease. Around 1995 and 1996, we unsuccessfully argued that the 2-year limit of 1F was unconstitutional and in conflict with the 5-year statute of limitations for co-workers' pneumoconiosis. We didn't prevail in that. The court ruled that each section had a purpose and they could live together. Another example is the responsible coal company is the one the miner has to work for, no matter how short that time was. A miner may have worked for Freeman Coal for 40 years, for Consol for one week, and Consol has the risk of the O.D. claim, even though nobody's going to argue that his disease probably came from his work with Freeman. That's the way the state has decided to deal with the unprovable issue, I say the unprovable issue, of which company he was working for when his x-ray turned positive. It's fair because all companies know the ruling when they go into the game. And over the course of time, they may be saved by it as often as they're hurt by it. The coal miner has a similar problem. If he worked in Illinois for Consol for 45 years and went to Kentucky and worked underground for Peabody Coal for one day, unless his contract for hire was in Illinois, he's lost his Illinois claim because his last exposure was in Kentucky. He'd have to look to Kentucky law for his remedy, even though under Kentucky law, if you don't work for at least two years in Kentucky, you don't have a Kentucky claim. This has happened to more than one miner. This may or may not be a perfect way to deal with the unproven, which is what we have in Blackwood. But it's the one we have. The parties know it. It's consistent. It's been there for quite some time. Now, Consol argues that our act is unconstitutionally vague because the notice requirement is as soon as practicable. But that's not vague. It just accommodates the nature of a work-related disease. Consol doesn't like that. Requiring the commission to make a judgment call doesn't make it vague. It just gives the commission one more judgment call to make, not the first one. And in this case, it just happens to be that his black lung x-ray was taken on January 26, 2004. His claim was filed on February 20, 2004. That's 25 days. It's fair for the commission to consider this to be as soon as practicable. Another problem with Consol's argument is its misunderstanding of the requirements of Section 1F. Consol believes that the petition is required to make his proof of disabled within the 1F period. And at page 29 of his brief, it says, quote, If an employee must provide proof of disabled within two years of his date of last exposure, there is no reason why I wouldn't be able to provide notice of the claim within the same time period, close quote. But that's not the law. The minor has to prove he had disablement within the first two years after leaving mining. But the proof can come after the two years has run. Now, as concerns the four corners of decisions, the first decision is whether Mr. Bird had pneumoconiosis. The commission decided he did. And that's a manifest way question. It was a commission's judgment call to make, and it decided to choose Dr. Kahn over Dr. Westerfield. That's supported by the record. Dr. Kahn's been the chief of medicine in a small hospital in a big mining area for 30 years. He's also been the director of the cardiopulmonary lab for 30 years. He's the one who evaluates pulmonary function tests for the local doctors for 30 years. He's not a bee reader, but he relied on opinion of Dr. Alexander, who is a bee reader and also a board-certified radiologist. Dr. Westerfield's a bee reader, but he's not a radiologist. So the commission's choice of Kahn and Alexander has support in the record, and it's not against the manifest way to the evidence. And once the decision was made that Mr. Bird had pneumoconiosis, the testimony of both these experts resolved the other issues, like the falling of the dominoes. Once you decide there's pneumoconiosis, the 1F defense kind of melts away. Dr. Kahn said that the pneumoconiosis would have been present at the time of his retirement, and Dr. Westerfield said that if you have pneumoconiosis now, you had it within two years of the time you left the mine. Based on the nature of the disease, if you ever have it, the overwhelming odds are you also had it when you left the mine. And once the decision was made that Mr. Bird had pneumoconiosis, the question of disability was also resolved by both experts. And I'm going to come back to your question. Once the decision was made, and according to the testimony, if you have pneumoconiosis, you necessarily have an impairment in the function of your lungs at the site of the scarring, whether you measure it or not. We have crude tools for measuring dysfunction of your lungs. Also, over the years, when we first started this 20 years ago, we automatically felt, well, if your PFTs are within the range of normal, you haven't had any impairment. Over the last few years, I think we've been making progress, but that's not true. If your FEV1 was 120% predicted in 1990, and it's 85% now, well, you're within the range of normal both times. But you've had very significant impairment. And if that can be tied to the coal mine, then you've got work-related impairment of your lung function, even in the range of normal. Both doctors said, if you have pneumoconiosis, you can't have any more exposure to coal mine dust. So both halves of the definition of disabling were proven. Now, as to the extent of the award, the award of 20% doesn't break any new ground. The Commission's been there before on cases like this. Mr. Bird worked at a coal miner for over 32 years. It's basically the only job he had since the age of 26. He left it because of his breathing problems, and now he can't do it anymore because of his work-related lung disease. That's a sufficient basis to support that 20% award, and I ask the Court to find that there is support in the record for each decision the Commission made, and it affirmed the award. Thank you. Thank you. No further questions? Thank you. Your Honors, with regard to the initial statements by opposing counsel, Consolidation Coal Company has never said that the filing of the claim was not noticed. In fact, it was the only notice that was ever provided to Consol. Secondly, with regard to the objection to Dr. Alexander's x-ray from 1981, his review of that, the objection remained to due process. That's page 36 of the original arbitration transcript. And thirdly, the assumed negative reading. We would assume that Consol would have obtained a negative reading of that chest film, but they're still going to rely on Dr. Alexander. So no matter who we got to read that film, and they read it as negative, it's going to hold no weight whatsoever to this arbitrator or this Commission. I think there's a problem with that. I think the qualifications of the person reading the film should matter, and it shouldn't be a blanket, well, we would assume it would be negative, but we're still going to go for the other side. Sorry. So with that said, Your Honors, How much better could you do than a B-reader? I'm sorry? How much better could you have done than another B-reader? Well, according to Mr. Wazor, he could have been a B-reader and a board-certified radiologist, or it could have been one of the original C-readers from NIOSH, or, you know, I don't know. Apparently, it didn't matter what qualifications our people were. It wasn't going to make a difference to that arbitrator or to the Commission. Basically, you know, on rebuttal, Your Honors, there are statutory requirements for an occupational disease claim. They have to prove disablement within two years of leaving the line. Section 1F and under 6C there to provide notice as soon as practicable after disablement. The Commission obviously found that the 1981 film was positive for poll worker's pneumoconiosis, which under Mr. Wazor's interpretation would mean he was disabled in 1981 and we didn't get notice for another 23 years. That's your worst-case scenario right there. Or if you want to say, oh, he was disabled when he left the line because he said the clock starts when they leave the line. Now, I don't see that in the statute anywhere either. But even with that sort of situation, why would you wait three years? I mean, if you're going to say, well, he didn't know he was disabled until the chest film was read in 2004, he wasn't disabled in 2001 then. I mean, the whole statute is based on when the date of disablement is. In this case, the disablement date, according to the arbitrator and according to the Commission, was the day Mr. Burke left the mine. If that is the case, then we don't get notice for three years and that is as soon as practicable. I don't think so. Not when you start looking at repetitive trauma claims that are heard under the Workers' Compensation Act that still have to abide by the 45-day rule. There is no reason if you have to prove that you're disabled within two years that your notice should not come shortly thereafter. And in this case, it did not. And if you want to take Dr. Alexander's positive interpretation, it came 23 years later. And, you know, as far as we're concerned, you know, the whole issue of he's disabled because he's been diagnosed with pneumoconiosis and can't work in the mine, clearly they can. Mr. Burke apparently did it for 21 years. And, you know, there was no change. If you look at Petitioner's Exhibit No. 2, which has the ILO classifications by Dr. Alexander, they are identical with regard to the markings on that chest film for pneumoconiosis. So we submit to you, Your Honors, that this case is against the manifest way to the evidence and should be vacated. Thank you, Counselor. The Court will take the matter under advisory for disposition.